**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**VALERIE MCMULLEN,**

    **Plaintiff,**

      **v.**

**SYNCHRONY BANK,** *et al.*,

    **Defendants.**

Civil Action No.  14-1983 (JEB)

---

**MEMORANDUM OPINION**

While a gym membership typically improves one's physical well-being at a slight cost to one's fiscal health, the case at hand concerns a fitness endeavor that had a far greater impact on the wallet than the waistline.  This suit alleges that fitness companies and two banks conspired to defraud gym member Valerie McMullen by opening unauthorized lines of credit in her name and processing unauthorized charges against that credit.  She thus brought this suit against seven named Defendants and various unidentified corporations and individuals, asserting seven counts that include violations of District of Columbia common law and the D.C. Consumer Protection Procedures Act.

In this Opinion, the Court adjudicates the Bank Defendants' Motion to Compel Arbitration, their Motion to Dismiss the three counts asserted against them, and Plaintiff's Motion for Leave to Amend her Complaint.  Finding no basis to compel arbitration and no ground to deny leave to amend, the Court will permit the suit to proceed with the proposed amended complaint.  And, concluding that the claims therein are largely not, unlike some gym memberships, an exercise in futility, the Court will deny the majority of the Motion to Dismiss.

I.      **Background**

The facts in this section are taken from the proposed Second Amended Complaint, which Plaintiff attaches to her Motion for Leave to Amend.  Because the Court ultimately decides to grant that Motion, see infra Section III.B, it treats this as the operative pleading throughout this Opinion.

Although many of the facts of this case are subject to dispute, all parties seem to agree that the beginning of Plaintiff's relationship with Defendants was fairly prosaic.  In September 2010, she signed up for 50 personal-training sessions with One World Fitness, a D.C. gym, at a cost of $5,040.  See Second Amended Complaint (SAC), ¶ 15.  One World represented that Plaintiff "could receive a refund at any time. . . upon request."  Id.  Three months later, she renewed her membership with One World, purchasing 150 training sessions at a cost of $8,050. Id., ¶ 16.  She charged the first 50 sessions through Chase Health Advance credit card and paid for the additional 150 sessions with a credit card unrelated to this case.  Id., ¶¶ 15-16.  In September 2011, Plaintiff canceled her membership and requested a refund of $2,210.  Id., ¶ 17. One World informed her that she would receive this money within 90 days.  Id.

In fact, according to McMullen, rather than canceling her membership and providing her the refund, Karim Stewart and Wayne Bullen, the primary owners of One World, obtained lines of credit with J.P. Morgan Chase and Synchrony Bank on her behalf, without her assent or knowledge.  Id., ¶ 18.  These credit lines together permitted charges of up to $8,500, which Stewart and Bullen used in full, without authorization from McMullen and for services never provided.  Id.  These unauthorized actions – opening credit lines and making charges – lie at the heart of Plaintiff's lawsuit.  The Court will not dwell on the allegations specific to Stewart, Bullen, and their corporate alter egos – all of whom are named Defendants in this suit – but will

instead focus on the facts pertaining to Chase and Synchrony, jointly referred to as the "Bank Defendants," since they have together filed the Motion to Dismiss at issue here. (Although Synchrony was previously known as GE Capital Retail Bank, see ECF No. 15 (Corporate Disclosure Statement), the Court will use its current name for ease of reference.)

In October 2011, after having canceled her One World membership, McMullen received a "CareCredit" credit card from Synchrony. SAC, ¶ 20. The credit card was accompanied by a financial statement indicating that a credit limit of $7,500 had been issued to her, and that the entire $7,500 had been billed and paid to "Bullen Wellness Washington DC" on September 21, 2011. Id. (Bullen Wellness is a chiropractor business in the District, also owned by Stewart and Bullen. Id. ¶ 11.) Shortly thereafter, McMullen called Synchrony to dispute the line of credit and the charges, but she was told "that the charge was authorized and payment due." Id., ¶ 22. Synchrony nevertheless agreed to send her a form to dispute the charge – a form that Plaintiff says she never received. Id.

That same month, McMullen received a financial statement from Chase Health Advance, indicating that "Bullen Wellness Washington DC" had charged $1,000, also on September 21, 2011, against a separate line of credit opened in her name. Id., ¶ 21. McMullen then telephoned Chase, which also failed to "process the dispute as requested by Ms. McMullen, or make any attempts to confirm the validity" of the charge. Id., ¶ 23.

In July 2012 and in March 2013, Plaintiff again called Synchrony to dispute the unauthorized line of credit and charges, and during the latter call she requested that the Bank "furnish a signed application requesting the line of credit, a promissory note, and a receipt or purchase authorization" for the $7,500 charge. Id., ¶¶ 24-25. On January 14, 2014, Plaintiff called Synchrony a fourth time, once more requesting "a promissory note, application, contract,

3

or any other documentary evidence in relation to the unauthorized line of credit and charge." <u>Id.</u>, ¶ 26.  This time, Synchrony assured her that it would mail her such documents within seven business days.  <u>Id.</u>  But all McMullen received was a letter thanking her for her "recent inquiry regarding [her] CARECREDIT/GECRB account," indicating that Synchrony would "make every effort to resolve [her] inquiry in a timely manner," and promising to "send . . . a written response with the actions take [*sic*] on [her] account" after completing review thereof.  <u>Id.</u>  McMullen alleges that she never received any further response from Synchrony nor any "documentary proof of her alleged indebtedness" to it.  <u>Id.</u>

While McMullen sought to dispute the unauthorized credit line and charges by telephone, she also sought the aid of the Attorney General for the District of Columbia, but such assistance proved unable to resolve the matter.  <u>Id.</u>, ¶¶ 19, 27.  McMullen states that Synchrony had been notified "on multiple occasions" by the Attorney General that Stewart and Bullen's charges were fraudulent, but "failed to take any corrective action, or at a minimum investigate the fraudulent conduct."  <u>Id.</u>, ¶ 27.  Instead, Synchrony charged McMullen interest on the unauthorized $7,500 charge, in the amount of $4,700.  <u>Id.</u>, ¶ 28.  Eventually, "[w]ith the threat of a damaged credit score hanging over her head, Ms. McMullen proceeded to attempt to pay the debts, all the while continuing to dispute the charges."  <u>Id.</u>, ¶ 29.  By April 2014, she had paid Chase the full $1,000 billed by Bullen Wellness, as well as more than $5,000 of the unauthorized charges billed to the Synchrony account in her name.  <u>Id.</u>, ¶¶ 30-31.  All the same, Synchrony "wrote off the false debt and reported the Unauthorized Charges . . . as a 'Charge Off'[,] thereby adversely impacting McMullen's credit."  <u>Id.</u>, ¶ 31.  Plaintiff believes such "inaccurate reporting to the credit agencies has further caused [her] substantial damages."  <u>Id.</u>

On September 12, 2014, Plaintiff filed suit in the Superior Court for the District of Columbia.  See ECF 1 (Notice of Removal) at 1.  She named Stewart and Bullen, their fitness companies (One World Fitness, Bullen Wellness, and Washington Chiropractic), Synchrony, Chase, and a handful of unnamed individuals and corporate entities as Defendants.  See id., Attach. 1 (Complaint), ¶¶ 1, 6-14.  The Complaint raised a bevy of claims against these Defendants – viz., violations of the CPPA, civil conspiracy, common-law fraud, conversion, breach of contract, breach of good faith and fair dealing, vicarious liability, and punitive damages.  See id., ¶¶ 36-83.  McMullen later amended her Complaint to include class-action claims, seeking relief on behalf of a putative class of "all One World Fitness customers who received financing from the Bank Defendants."  Notice of Removal at 2.  Defendant Chase then removed the suit to federal court pursuant to the diversity-removal provisions of the Class Action Fairness Act.  Id. at 4-8.  Plaintiff thereafter sought remand to state court, see ECF No. 12, but Judge John Bates, to whom the case was previously assigned, denied her motion, even after permitting additional jurisdictional discovery.  See ECF Nos. 26, 52, 55.

With the matter of removal settled, Chase moved to dismiss the claims asserted against it – specifically, violations of the CPPA, fraud and conspiracy under D.C. common law, and punitive damages.  See ECF No. 57 (MTD).  Defendant Synchrony, meanwhile, filed a Motion to Compel Arbitration, see ECF No. 61 (MTC), and also joined Chase's Motion to Dismiss.  See ECF No. 63 (Notice of Joinder).  The case was reassigned to this Court on October 22, 2015, see ECF No. 64, and, after briefing was completed on Defendants' Motions, Plaintiff sought leave to amend her complaint a second time.  See ECF No. 70 (MTA).  The three Motions are now ripe for adjudication.

## II.      Legal Standard

### A.  Motion to Compel Arbitration

The Federal Arbitration Act "is a congressional declaration of a liberal federal policy favoring arbitration agreements." Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983) (referencing 9 U.S.C. § 2).  Suits brought "upon any issue referable to arbitration under an agreement in writing for such arbitration" must be stayed "until such arbitration has been had . . . , providing the applicant for the stay is not in default in proceeding with such arbitration" and the court has been "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3.

When considering a motion to compel arbitration, "the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c)." Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 67 (D.D.C. 2003) (internal quotation marks and citation omitted); see also Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008) ("The district court properly examined [defendant's] motion to compel arbitration under the summary judgment standard of Federal Rule of Civil Procedure 56(c), as if it were a request for 'summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.'") (quotation marks and citation omitted).  "As the party seeking to compel arbitration, Defendant[] must first come forward with evidence sufficient to demonstrate an enforceable agreement to arbitrate." Hill v. Wackenhut Services Int'l, 865 F. Supp. 2d 84, 89 (D.D.C. 2012) (citation omitted).  The burden then shifts to Plaintiff "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." Grosvenor v. Qwest Communications Intern., Inc., 2010 WL 3906253, at *5 (D. Colo. 2010).  Arbitration

should be compelled if "there is 'no genuine issue of fact concerning the formation of the agreement' to arbitrate.'" Kirleis v. Dicki, McCamey & Chilcote, PC, 560 F.3d 156, 159 (3d Cir. 2009) (quoting Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980)).

To review the Rule 56 standard, a fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).  When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P.  56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is

"merely colorable" or "not significantly probative," summary judgment may be granted.  Liberty

Lobby, Inc., 477 U.S. at 249-50.

    B.  <u>Motion to Dismiss</u>

    Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a

complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendants'

Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must

grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  <u>Sparrow</u>

<u>v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting <u>Schuler v. United</u>

<u>States</u>, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); <u>see also</u> <u>Jerome Stevens Pharms.,</u>

<u>Inc. v. FDA</u>, 402 F.3d 1249, 1250 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to

impose a great burden upon a plaintiff," <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005),

and she must thus be given every favorable inference that may be drawn from the allegations of

fact.  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 584 (2007).

    Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6)

motion, <u>id.</u> at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)

(quoting <u>Twombly</u>, 550 U.S. at 570).  Plaintiff must put forth "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

<u>Id.</u>  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an

inference unsupported by the facts set forth in the Complaint.  <u>Trudeau v. Fed. Trade Comm'n</u>,

456 F.3d 178, 193 (D.C. Cir. 2006) (quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)

(internal quotation marks omitted)).  For a plaintiff to survive a 12(b)(6) motion even if

"recovery is very remote and unlikely," moreover, the facts alleged in the complaint "must be

enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555-56

(citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

In evaluating the sufficiency of Plaintiff's Complaint under Rule 12(b)(6), the Court may

consider "the facts alleged in the complaint, any documents either attached to or incorporated in

the complaint[,] and matters of which [the court] may take judicial notice." Equal Emp't

Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

The Court may thus consider those materials on a motion to dismiss without treating the motion

"as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); see also Marshall v.

Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008).

## III.    Analysis

The Court first addresses Synchrony's Motion to Compel Arbitration.  Finding for

Plaintiff on that matter, the Court will then turn to her Motion to Amend the Complaint and

finally the Bank Defendants' Motion to Dismiss.

### A.   Arbitration

As previously explained, this suit concerns credit-card debt accrued on a Synchrony

"CareCredit" card that Plaintiff alleges she never applied for, opened, or used.  Synchrony now

moves this Court to compel arbitration based on the Arbitration Provision in the Card

Agreement, which informs users that "most disputes between you and [the Bank] will be subject

to individual arbitration," and "[you] agree not to participate in a class, representative, or private

attorney general action against us in court or in arbitration."  MTC at 6 (quoting ECF No. 61,

Exh. 1 (Card Agreement) at 5, 8).  The Agreement provides that "Utah law shall apply to the

extent that state law is relevant . . . in determining the validity of this Provision."  Id. at 6.

Synchrony asserts that this choice-of-law provision is binding, so Utah law covers the dispute at issue here.  See id. at 9-10.

Plaintiff contends that she "never entered into any agreement with Defendant Synchrony, let alone an arbitration agreement that would curtail her right to contest the . . . charges."  MTC Opp. at 2.  But Synchrony rejoins that the Card Agreement clearly states that "[b]y opening or using your account, you agree to the terms of this Agreement," and it further maintains that by making payments on the card, McMullen "used" it within the meaning of this provision.  See MTC at 6.  Plaintiff not only contests that characterization of her payments – which, she insists, she made "over her protests and in the face of severe risk to her credit score" – but also rejects Synchrony's choice-of-law analysis.  See MTC Opp. at 2.  In her view, the law of the District of Columbia, not Utah, governs the question of whether any binding agreement exists, and under D.C. law, no "consent[] to arbitrate" exists where there is no "meeting of the minds" on that matter.  See id. at 7 (quoting Bailey v. Fannie Mae, 209 F.3d 740, 746 (D.C. Cir. 2000)).

Fortunately for the Court, the parties agree on the threshold question – namely, whether any agreement to arbitrate exists, for "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  AT&T Tech., Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986).  The Supreme Court has instructed, furthermore,  that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  "To determine the applicable state law in a F[ederal] A[rbitration] A[ct] case, federal courts use the conflict of law principles applied by the state in which they sit."  Aneke v. Am. Exp. Travel Related Servs., Inc., 841 F. Supp. 2d 368, 375 (D.D.C. 2012).  The

Court thus first considers which state's law governs here and then applies it to the Card Agreement.

### 1. Choice of Law

In the District of Columbia, when resolving a conflict of laws, "the court uses a 'constructive blending of the governmental interest analysis and the most significant relationship test,' to determine which state's laws apply." PCH Mut. Ins. Co. v. Cas. & Sur., Inc., 569 F. Supp. 2d 67, 72-73 (D.D.C. 2008) (quoting Stephen A. Goldberg Co. v. Remsen Partners, Ltd., 170 F.3d 191, 194 (D.C. Cir. 1999)). This test, which mirrors the Restatement (Second) of Conflict of Laws § 188, considers "(1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the contract's subject matter; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co., 129 F.3d 143, 148 (D.C. Cir. 1997).

Here, if an agreement did exist, it would have been formed in the District. This city is also where Plaintiff resides, where the contract negotiation (if any) would have occurred, and where the contract's performance would take place. And the parties seem to agree that the impetus for any contract would have been the financing of charges made by McMullen, who resides in the District. Most importantly, although Synchrony is headquartered in Utah, the Bank "offers no evidence (and does not even argue) that [Utah] has a potential interest in having its law applied such that a 'true conflict' of laws or governmental interests exists." PCH Mut. Ins. Co., 569 F. Supp. 2d at 73.

Synchrony argues only that other courts in this District have "enforced a virtually identical Utah choice of law provision," MTC Reply at 4, pointing to Judge Gladys Kessler's decision in Aneke. In that case, however, the plaintiffs did not dispute the existence of a valid

contract (there, a credit-card agreement) between the parties.  The plaintiffs there instead

challenged the enforceability of the arbitration provision within the contract, a matter the court

determined was governed by the express choice-of-law provision in the contract that, all agreed,

had been properly formed.  See Aneke, 841 F. Supp. 2d at 376.  By contrast, Plaintiff here argues

that she never consented to any agreement with Synchrony, let alone the one to arbitrate

contained in the Card Agreement, so there is no presumption that the Agreement's choice-of-law

provision governs.  See Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012)

("Applying the choice-of-law clause to resolve the contract formation issue would presume the

applicability of a provision before its adoption by the parties has been established.").  Given the

significant relationship of the parties to the District of Columbia and Defendant's failure to

identify any countervailing interests of the state of Utah, the Court concludes that the question

whether any agreement – and, specifically, any agreement to arbitrate – was formed between the

parties is governed by D.C. law.  .

### 2. *Existence of Agreement*

McMullen asserts that she never signed any contract or entered into any agreement with

Synchrony.  The Bank, by contrast, insists that the parties did form a contract, in the form of the

Card Agreement.  While both parties concur that only Synchrony signed the Card Agreement,

the Bank points out that under District law, "[w]hen the parties to a contract set forth the terms of

their agreement in writing and manifest in some manner a clear intent to be bound, the absence

of one party's signature on the written agreement will not defeat or invalidate the contract,

[because] . . . mutual assent to a contract . . . may be shown instead, or in addition to, by the

conduct of the parties."  Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995).

At the same time, Plaintiff correctly notes that in D.C., "an enforceable contract does not exist unless there has been a 'meeting of the minds' as to all material terms.  In other words, a contract is not formed unless the parties reach an accord on all material terms and indicate an intention to be bound."  Bailey, 209 F.3d at 746.  Thus, "any apparent contract is void[] if the minds of the parties do not meet honestly and fairly and without mistake or mutual misunderstanding upon all the issues involved."  Estate of Taylor v. Lilienfield, 744 A.2d 1032, 1035 (D.C. 2000).  This is what McMullen believes happened here, as she maintains that she never intended to enter any agreement with the Bank.  Under District law, moreover, "the party asserting the existence of an enforceable contract bears the burden of proving that there has been a 'meeting of the minds,' or mutual assent, as to all material terms."  Am. Prop. Const. Co. v. Sprenger Lang Found., 768 F. Supp. 2d 198, 202 (D.D.C. 2011) (citing Ekedahl v. COREStaff, Inc., 183 F.3d 855, 858 (D.C. Cir. 1999)).  Insofar as the Card Agreement represents the "offer or proposal" of a contract between Plaintiff and the Bank, the Bank must establish that Plaintiff "accepted by word or deed."  RDP Techs., Inc. v. Cambi A.S., 800 F. Supp. 2d 127, 141 (D.D.C. 2011).

Synchrony's chief contention is that a meeting of the minds did occur because the Card Agreement expressly mandated that any "use" of the credit card would constitute acceptance of the Agreement (including the arbitration provision).  McMullen, the Bank insists, "used" the card by making "21 payments totaling $5,024 over two years" and by "enroll[ing] the Account in an e-bill service and thereafter updat[ing] her mailing address."  MTC at 6-8.  The Court does not buy this argument.

First, McMullen avers that she "never received the 'GE Money Bank Credit Card Agreement,'" and therefore could not have known that "using" the credit card would bind her to

13

the terms of the Agreement.  See MTC Opp., Exh. A (Declaration of Valerie McMullen), ¶ 16.

Second, she maintains that she never made any purchases on the card – the most common way a

consumer would "use" a credit card.  Indeed, Synchrony points to no evidence or authority

suggesting that simply making payments against monthly billing statements somehow constitutes

"use."  Third, from the time McMullen first became aware of the unauthorized lines of credit and

charges, her conduct evinces only a desire to challenge the opening of the credit card and the

charges made to it: She disputed the first bill she received in October 2011 from Synchrony by

telephone "on numerous occasions," see id., ¶ 8, and when her telephone entreaties were

unavailing, she filed a complaint with the Office of the D.C. Attorney General, following up with

multiple emails to the Office.  See id., ¶¶ 10-14.  These are not the activities of an individual who

intended to "use" a credit card.

　　　　Finally, to the extent that the Bank implies that payment confirms the validity of the

disputed charges, that implication is rebutted by Plaintiff's statement that she "only made

payments on the account to prevent Synchrony Bank from damaging [her] credit."  McMullen

Decl., ¶ 17.  It is further undermined by Plaintiff's Declaration – and the correspondence she

submits in corroboration – demonstrating that, concurrent with those payments, she repeatedly

and consistently contested the charges with the Bank and with the Attorney General.  See MTC

Opp., Exhs. 3-6.  In light of this evidence, Synchrony's argument that "[w]hatever her reasons

for making payments . . . , her conduct manifests acceptance of the Account and the underlying

contract terms," MTC Reply at 8, does not persuade.

　　　　The Court thus cannot conclude that, under the facts here, mere payment alone

constitutes assent to an agreement with the Bank.  Were that the case, consumers seeking to

challenge unauthorized lines of credit while also protecting their credit score would be placed in

a Catch-22 situation.  (Nor – it hardly bears mentioning – does Plaintiff's switch to paperless

bills or to a new address have relevance; indeed, Defendants do not even try to explain how those

acts could be a "use" of the CareCredit card.)  Because, under District of Columbia law, "both

parties must have the <u>distinct</u> intention to be bound," where ambiguity exists about one party's

intent, the party seeking to enforce the agreement has not carried its burden.  <u>See</u> <u>RDP Techs.,</u>

<u>Inc.</u>, 800 F. Supp. 2d at 141 (citation and quotation removed) (emphasis added).  This echoes the

applicable Rule 56 standard: if Plaintiff "raise[s] a genuine issue of material fact as to the making

of the agreement" to arbitrate, courts will not compel arbitration.  <u>Grosvenor</u>, 2010 WL 3906253,

at *5.  In this case, Synchrony has not provided evidence sufficient to establish a "meeting of the

minds" about the Card Agreement or its terms, so the Court concludes that no contract was

formed between the two parties.  As such, the arbitration provision contained in Synchrony's

Card Agreement is not enforceable against McMullen in this case, and the Court will deny the

Bank's Motion.  Given this ruling, the Court need not address Plaintiff's alternative argument,

<u>see</u> MTC Opp. at 11, that Synchrony has forfeited its right to arbitration by raising the issue only

at this stage of the litigation.

    B.  <u>Motion to Amend</u>

As previously noted, after the Bank Defendants' Motion to Dismiss was fully briefed,

Plaintiff moved to amend her Complaint a second time, in "an attempt to satisfy the Bank

Defendants' desire for a more specific statement of their malfeasance."  MTA at 4.  Typically,

"[i]n the absence of . . . undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

opposing party by virtue of allowing the amendment, futility of amendment, etc. – the leave

sought [to amend] should, as [Rule 15(a)] requires, be 'freely given.'"  <u>Foman v. Davis</u>, 371 U.S.

178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)); see also Osborn v. Visa, Inc., 797 F.3d 1057,

1062 (D.C. Cir. 2015) (same).  Defendants here oppose the amendment not because of undue

delay or prejudice, but because the proposed Second Amended Complaint "is not materially

different than her current complaint" and still fails to state a claim against either Bank

Defendant, "rendering amendment futile."  MTA Opp. at 2, 4.

      "An amended complaint is futile if it merely restates the same facts as the original

complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a

legal theory, or could not withstand a motion to dismiss."  Adair v. Johnson, 216 F.R.D. 183, 186

(D.D.C. 2003).  Courts often assess a proposed amendment's futility against a hypothetical

motion to dismiss; here, because the sole basis for Defendants' opposition to the amendment is

futility, and because Defendants have already filed their Motion to Dismiss, the Court will

analyze the viability of the proposed Second Amended Complaint against Defendants' already-

filed Motion.  See id. at 187-88 (examining whether proposed amendment would be futile by

testing its allegations against Defendants' prior-filed motion to dismiss).  If, as Defendants claim,

the proposed Second Amended Complaint would not defeat the arguments raised in their Motion,

the Court will deny leave to amend and dismiss the claims.  See Jackson v. Teamsters Local

Union 922, 991 F. Supp. 2d 64, 67 (D.D.C. 2013) ("[A]mendment . . . would be futile . . . [and] a

district court may properly deny a motion to amend if the amended pleading would not survive a

motion to dismiss.") (citing In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C.

Cir. 2010)) (quotation marks omitted).  If, on the other hand, the Court concludes that some or all

of Plaintiff's claims, as pled in the proposed Second Amended Complaint, do survive

Defendants' Motion, the Court will grant leave to amend and allow McMullen to proceed on

them.  The Court now analyzes Defendants' Motion to Dismiss, using the facts as alleged in the

Second Amended Complaint.

C.  Motion to Dismiss

Of the seven counts Plaintiff asserts in the Second Amended Complaint against the seven

Defendants, three are alleged against the two Bank Defendants: violations of the D.C. CPPA

(Count I), common-law fraud and conspiracy to commit fraud (Count III), and punitive damages

(Count VII).  The Court will address each in turn.

1.  *CPPA*

The CPPA "is a comprehensive statute designed to provide procedures and remedies for a

broad range of practices which injure consumers."  Sundberg v. TTR REALTY, LLC, 109 A.3d

1123, 1129 (D.C. 2015) (internal quotation marks and citation omitted).  Courts "have long

considered the CPPA to be a remedial statute that must be 'construed and applied liberally to

promote its purpose.'"  Id. (quoting D.C. Code § 28-3901(c)); see also Jackson v. Culinary Sch.

of Washington, 788 F. Supp. 1233, 1252 (D.D.C. 1992) ("The CPPA enacts a broad scheme to

protect consumers from unscrupulous merchants connected with the supply side of the consumer

transaction.").  Defendants Chase and Synchrony raise two initial roadblocks that they believe

bar McMullen's claims under this statute.  After finding both threshold defenses wanting, the

Court will proceed to the merits of this cause of action.

a.  Threshold Issues

Defendants first contend that Plaintiff's CPPA claims are subject to the heightened

pleading standards of Federal Rule of Civil Procedure 9(b) because they are premised on

allegations of misrepresentations, making them analogous to common-law fraud claims.  In

support of this proposition, they point to Witherspoon v. Philip Morris, Inc., 964 F. Supp. 455

(D.D.C. 1997), which held that "allegations supporting the [CPPA] claim must be pleaded with particularity because they are akin to allegations of fraud." Id. at 464.  A recent decision by another court in this District, however, observed that the CPPA "was 'intended to overcome the pleadings problem associated with common law fraud claims by eliminating the requirement of proving certain elements such as intent to deceive and scienter,'" and thus was not subject to Rule 9(b)'s pleading requirements.  See Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, No. 14-0892, 2015 WL 5449791, at *21 (D.D.C. Sept. 16, 2015) (quoting Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1073 n.20 (D.C. 2008)).

Bound by neither, the Court finds the rationale in Campbell more persuasive.  For if a CPPA claim is "a cause of action specifically created with the intent to relieve plaintiffs from the burden of pleading fraud," as recent decisions of the D.C. Court of Appeals suggest, imposing the particularized pleading requirements of Rule 9(b) on such claims would undermine the statute's purpose.  See id. (citing Fort Lincoln and Saucier v. Countrywide Home Loans, 64 A.3d 428, 442-44 (D.C. 2013)).  The Court, accordingly, will not hold the Complaint's CPPA claim to a heightened pleading standard.

Defendants next believe that they cannot be liable for violations of the CPPA because they are not "merchants" within the meaning of the statute.  It is true that "the CPPA does not cover all consumer transactions, and instead only covers 'trade practices arising out of consumer-merchant relationships.'"  Sundberg, 109 A.3d at 1129 (quoting Snowder v. District of Columbia, 949 A. 2d 590, 599 (D.C. 2008)).  The statute defines "merchant" as one "who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services . . . or would supply the goods or services which are or would be the subject matter of a trade."  D.C. Code § 28-3901(a)(3).  This "includes one who sells consumer

18

credit as well as those entities which take an assignment of the credit account and continue the extension of credit to the consumer." Jackson, 788 F. Supp. at 1253. A "merchant need not be the 'actual seller of the goods or services' complained of, but must be 'connected with the "supply" side of the consumer transaction.'" Adler v. Vision Lab Telecomm., Inc., 393 F. Supp. 2d 35, 39 (D.D.C. 2005) (quoting Save Immaculata/Dunblane, Inc. v. Immaculata Prep Sch., Inc., 514 A.2d 1152, 1159 (D.C. 1986)). This definition plainly covers the Bank Defendants here.

Chase and Synchrony nonetheless argue that "Plaintiff's claims stem from charges for services that the One World Fitness defendants allegedly never provided," so those and only those Defendants are "merchants" covered by the CPPA; in other words, they presumably imply that only one merchant may be liable for a given transaction. See MTD at 10. But the statute explicitly establishes liability for "one or more merchants alleged . . . to have taken part in or carried out a trade practice . . . [or] who may be deemed legally responsible for the trade practice." D.C. Code § 3901(a)(5). Here, the Banks undoubtedly took part in the trade practice Plaintiff seeks to challenge. The Complaint details at length their "participation in the fraudulent scheme to obtain the unauthorized credit lines and unauthorized charge" central to this suit. See, e.g., SAC, ¶¶ 20-31. McMullen specifically alleges that "Defendant GE Capital [Synchrony] entered into the joint venture with the One World Fitness Defendants for the common purpose of providing health care financing to One World Fitness customers, and with the common goal of obtaining a profit," and "Defendant Chase entered into the joint venture" for the same purpose. Id., ¶¶ 6-7. According to Plaintiff's Complaint, in this joint venture One World submitted credit-card applications to the Bank Defendants, the Defendants approved those applications on behalf of the applicants but without their knowledge, and the Bank Defendants then processed charges

to the One World Defendants against those lines of credit.  See id.  According to Plaintiff, the Bank Defendants and One World Defendants each "had an equal right to control the manner in which the joint venture operated."  Id., ¶ 7.  These allegations more than suffice to establish a "connection with" the trade practice in question.

The only authority Defendants identify for their contrary position is Howard v. Riggs Nat'l Bank, 432 A.2d 701 (D.C. 1981), which is readily distinguishable.  In Howard, a loan officer of the Riggs Bank, while discussing a construction loan to finance the renovation of the plaintiff's home, recommended a contractor whose work she had seen and admired.  Id. at 703-04.  Howard hired that contractor, and when the contractor did not complete performance of the renovation, he complained that Riggs, through its employees, had violated the CPPA by misrepresenting the quality of the contractor's work.  The Superior Court found, and the D.C. Court of Appeals affirmed, that "[q]uite plainly, Riggs does not fall within th[e] category" of "merchant . . . connected with the 'supply' side of the consumer transaction" of which she complained.  Id. at 709.  But the Banks' involvement in the allegedly fraudulent transaction in this case is, of course, far greater than a mere recommendation for services.  And in this case, the trade practice Plaintiff contests is the one provided by the Banks – who are named defendants – whereas what the plaintiff challenged in Riggs was not a trade practice at all, for the loan officer's casual recommendation was not a service tendered as part of a transaction between the Bank and the consumer.  As these differences elucidate, Howard does not undermine the Court's conclusion that the Banks are "merchants" within the meaning of the CPPA.

          b.     Merits

Having navigated around these preliminary shoals, the Court now steams ahead to the merits of Plaintiff's CPPA claim.  She contends that the two Bank Defendants violated "no fewer

than six discrete provisions of the DCCPPA."  MTD Opp. at 10; <u>see also</u> SAC, ¶¶ 48-70

(alleging violations of D.C. Code §§ 28-3904(b), (e), (e-1), (p), (q), and (u)).  Because the

Second Amended Complaint clearly states a claim for violations of at least two of these

provisions, the Court will deny Defendants' Motion as to this count.

*i.     § 28-3904(q): Failure to Supply Contract*

Section 28-3904(q) of the CPPA establishes liability for merchants who "fail to supply to

a consumer a copy of a sales or service contract, lease, promissory note, trust agreement, or other

evidence of indebtedness which the consumer may execute."  Plaintiff alleges that she requested

from the Bank Defendants "documents . . .  that would validate the Unauthorized Credit Lines

and Unauthorized Charges," and that they failed to provide her any responsive materials.  <u>See</u>

SAC, ¶ 48.

As a reminder, McMullen asserts that although she "financed [] 50 [One World] training

sessions through Chase Health Advance" in September 2010, the lines of credit she challenges

here are those that were opened <u>after</u> she had canceled her One World membership in September

2011.  <u>See id.</u>, ¶¶ 15, 17.  Specifically, the Chase Health account opened in September 2011

represents a <u>second</u> Chase credit line, for which she received a new credit card with a credit limit

of $1,000 and a welcome message thanking her "for signing up at Bullen Wellness."  <u>See id.</u>, ¶

20.  She also received a CareCredit card from Synchrony with a $7,5000 credit limit.  <u>See id.</u>

She insists that she did not receive any contract for either this second Chase credit line or the

Synchrony one.  <u>See id.</u>, ¶¶ 26, 48.  Put another way, McMullen maintains that although she

received billing statements and physical credit cards associated with the unauthorized lines of

credit, she never received any actual Card Agreement.  <u>See id.</u>, ¶ 26.

21

After the October 2011 billing statements put her on notice that these credit lines were opened in her name, McMullen alleges that at least twice "[she] request[ed] a promissory note, application, contract, or any other documentary evidence in relation to the unauthorized line[s] of credit and charge[s] made by Bullen Wellness." Id., ¶¶ 25-26.  After her fourth call to Synchrony and second request for her contract, McMullen recounts that "[Synchrony] stated that it would mail the requested documents to [her] within seven business days." Id., ¶ 26.  Instead, she received a letter from Synchrony thanking her for her "recent inquiry regarding . . . [her] CARECREDIT/GECRB account," and assuring her that the Bank would "make every effort to resolve [her] inquiry in a timely manner," including by sending her "a written response with the actions taken on [her] account." Id.  Notwithstanding this pledge, McMullen maintains she "did not receive any further response from [Synchrony] in response to her request for documentary proof of her alleged indebtedness to [Synchrony]." Id.

McMullen thus contends that she repeatedly requested but never received a contract, application, or other documentation demonstrating that she had agreed to open a second line of credit with Chase or a line of credit with Synchrony.  The Complaint's allegations describe the Banks' simple "fail[ure] to supply to a consumer a copy of a sales or service contract," an omission that falls squarely within the conduct § 28-3904(q) proscribes. See, e.g., Renchard v. Prince William Marine Sales, Inc., 87 F. Supp. 3d 271, 284 (D.D.C. 2015) (denying merchants' motion for summary judgment on § 28-3904(q) claim where they did not provide plaintiff with contract for repair services but proffered only "monthly invoices" as evidence of plaintiff's authorization for those repairs).  The Court must, at this stage, credit Plaintiff's allegations; unlike a Motion to Compel Arbitration, a Motion to Dismiss must be adjudicated based only on the facts in the Complaint.  The Court, accordingly, may not consider the declarations and other

evidence Defendants attached to their Motion to Compel in determining whether McMullen received the relevant documents for purposes of the CPPA.  Accepting Plaintiff's version of events as true, the Court concludes that she has established a violation of § 28-3904(q).

The Bank Defendants' only other response to McMullen's § 28-3904(q) claim is to point out that Plaintiff "acknowledges that [she] agreed to open a Chase Health Advance account." See MTD at 13.  Of course, McMullen admits she agreed to open a line of credit with Chase in 2010, but it is the second line of credit Chase opened in her name in 2011 to which she objects. Though it is not clear from the Motion to Dismiss, it is possible that Chase intends to imply that the agreement for the first line of credit vitiates the need for a copy of the contract for the second line of credit with the Bank, such that Chase did not run afoul of § 28-3904(q) by failing to provide McMullen with any such contract.  See Banks v. D.C. Dept. of Consumer and Regulatory Affairs, 634 A.2d 433, 439-40 (D.C. 1993) (merchant could not violate § 28-3904(q) because it had "no obligation . . . to supply a written contract").  But the Banks offer neither argument nor authority suggesting that a contract for one line of credit governs a different credit line, even if opened by the same consumer with the same bank.  And Defendants certainly do not explain how a prior contract with Chase obviates the need for a subsequent one with Synchrony. That Plaintiff had previously entered into an agreement with Chase Health is therefore not inconsistent with her claim that both Banks failed to provide her "a copy of a sales or service contract" for the credit lines at issue here, thereby contravening § 28-3904(q).

### ii.  § 28-3904(e): Misrepresentation

Plaintiff has also stated a claim that the Bank Defendants violated § 28-3904(e), which prohibits merchants from making any "misrepresent[ation] as to a material fact which has a tendency to mislead."  While Defendants argue that the Complaint "fails to identify any

misrepresentation supposedly made by Chase," MTD at 13, McMullen, in fact, alleged several

critical ones: Both Defendants "misrepresent[ed] the material fact that Ms. McMullen was

required to pay the Bank Defendants for the Unauthorized Charges despite the fact that the

charges were fraudulent and the Bank Defendants could not substantiate the charges," SAC,

¶ 50; they falsely represented in billing statements that McMullen herself had authorized charges

for "Bullen Wellness Washington DC" in the amounts of $1,000 and $7,500, respectively, id., ¶¶

51-52; they misrepresented in subsequent billing statements that "payment [was] due," id., ¶ 53;

and they misrepresented that the charges "conferred a right on the Bank Defendants, and a

corresponding obligation on Ms. McMullen . . . to pay the Bank Defendants regardless if the

transactions were fraudulent." Id., ¶ 57.  Synchrony, moreover, "misrepresent[ed] that it would

provide Ms. McMullen with copies of the documents she requested," which "misled" her into

believing "that the fraudulent claims were being investigated." Id., ¶ 49.

These representations are identified with particularity in the Complaint and are material

to the transaction at issue here.  They undoubtedly "tend to mislead," as consumers generally

assume that the charges listed in billing statements they receive represent debt they previously

authorized and now owe.  Nor is McMullen's skepticism about these representations problematic

for her CPPA claim, for under the statute, a consumer need not have believed the

misrepresentation for it to come within the ambit of § 28-3904(e).  See Athridge v. Aetna Cas. &

Sur. Co., 351 F.3d 1166, 1175 (D.C. Cir. 2003) ("It is a violation of the Consumer Protection Act

for any person to misrepresent a material fact which has a tendency to mislead . . . whether or not

a consumer is in fact misled, deceived or damaged thereby.").  And even if the

misrepresentations were accidental, McMullen may still be entitled to relief, for the CPPA does

not require "that, to be actionable, an alleged misleading statement or omission must be willful or intentional." Fort Lincoln, 944 A.2d at 1073.

In fact, the CPPA does not require much by way of pleading to state a claim under § 28-3904(e). See Wetzel v. Capital City Real Estate, LLC, 73 A.3d 1000, 1005 (D.C. 2013) (allegation that defendant "misrepresented that the basement and walls were free from defect, which misled [plaintiff] into thinking this Property was worth more than it actually was . . . stated a legally viable claim under D.C. Code § 28–3904(e)") (quotation mark and citations omitted). All that is required is "an affirmative or implied misrepresentation" that "a reasonable consumer" would deem misleading. See Saucier v. Countrywide Home Loans, 64 A.3d 428, 442-43 (D.C. 2013). Here, Plaintiff has alleged that Defendants' representations that they would send her documented proof of her account agreement and charges led her to trust that her account was being investigated. She has also alleged that their representations that she owed $8,500 – and was obliged to pay even if she disputed the debt – led her to make payments to the Banks despite her doubts concerning the legitimacy of those charges. Defendants have not challenged the legal sufficiency of any of these alleged misrepresentations. Bearing in mind that "because it is a remedial statute, the CPPA must 'be construed and applied liberally to promote its purpose,'" the Court concludes that Plaintiff's allegations state a claim for relief under § 28-3904(e). See Saucier, 64 A.3d at 442 (quoting D.C. Code § 28-3901(c)). Count I may thus proceed against the Bank Defendants.

### 2. Fraud and Conspiracy

In Count III Plaintiff alleges that the Bank Defendants also violated D.C. common law by conspiring to defraud and actually defrauding her. See SAC, ¶ 74. Specifically, she asserts that the Banks "participated in the fraudulent scheme [with One World and Bullen] by providing

financing for One World Fitness customers based on fraudulent applications . . . [and] by processing fraudulent payments to Bullen Wellness . . . for services that Bullen Wellness never supplied." Id.  The Court will address the fraud and conspiracy claims separately.

    i.  Fraud

  "The components in this jurisdiction of a successful common law fraud claim are well-settled:  'Fraud is never presumed and must be particularly pleaded. . . .  The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation.'"  Va. Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc., 878 A.2d 1226, 1233 (D.C. 2005) (quoting Atraqchi v. GUMC Unified Billing Servs., 788 A.2d 559, 563 (D.C. 2002)).  In the District, the "knowledge of the falsity [element] may be satisfied by showing that the statements were recklessly and positively made without knowledge of (their) truth."  Howard, 432 A.2d at 706 (internal quotation marks and citation omitted).  Unlike McMullen's CPPA claim, her common-law fraud claim is governed by the heightened pleading standard imposed by Rule 9(b).  That Rule "requires particularity when pleading 'fraud or mistake,' while allowing '[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally.'"  Iqbal, 556 U.S. at 686 (quoting Fed. R. Civ. P. 9(b)).  To satisfy this pleading standard in a fraud claim, plaintiffs must identify with particularity the "time . . . of the false misrepresentations," "who precisely was involved in the fraudulent activity," the "fact misrepresented," and "facts that exemplify the purportedly fraudulent scheme."  U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251, 1256-59 (D.C. Cir. 2004); see also id. at 1259 ("In sum, although Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud . . . defendants must be able to

'defend against the charge and not just deny that they have done anything wrong.'") (citation omitted).

Defendants believe that the Complaint "alleges none of the[] elements" of fraud, see MTD at 15, but Plaintiff's specific allegations bely that blanket denial.  The facts here plainly satisfy the elements of fraud under D.C. law: (1) Chase and Synchrony sent billing statements to McMullen representing that she owed them a total of $8,500, though she maintains that she never incurred such a debt; (2) that representation is indisputably material to the Banks' interactions with Plaintiff; (3) Plaintiff alleges that, either because of the Banks' fraudulent relationship with the One World Defendants or as a result of her many telephone complaints, the Banks knew or should have known that the charges were invalid; (4) they intended, through their representations, to induce her to pay off debt she did not owe; and, (5) they succeeded, as she alleges that she "justifiably relied on Defendant[s]' false representation[s] that she was obligated to make payment, ultimately paying the fully $1,000 demanded by Defendant Chase" and "more than $5,000" to Synchrony.  See SAC, ¶¶ 75-76.

Defendants argue, unpersuasively, that such allegations "at most, refer[] to a non-actionable opinion."  MTD at 16.  The Court does not agree; the Banks' insistence that "the charge was authorized and payment due," SAC, ¶ 23, hardly could be considered an opinion, and the assertion that reasonable customers understand billing statements to represent a mere suggestion or point of view strains credulity.

The Banks' only other basis for dismissing McMullen's common-law fraud claim is that "Count III does not contain a single allegation about Chase's state of mind."  MTD at 16.  But for the tort of fraud, "[i]t is enough if the representation that is made was known to the person making it to be untrue, or that he did not know it to be true, and had no sufficient reason to

believe it to be true." <u>Browning v. Nat'l Capital Bank of Washington</u>, 13 App. D.C. 1, 17 (D.C.

Cir. 1898). Plaintiff alleges that she "never applied for[] or requested the line of credit" and

"never authorized a purchase," implying that a statement that she owed the Banks for such a

purchase must have been false, for there was no sufficient reason for the Banks to believe the

line of credit or charges were authorized. <u>See</u> SAC, ¶ 20. These allegations, coupled with the

Banks' failure to investigate the charges after she had contacted them to voice her doubts about

their veracity, may constitute "reckless disregard for [the] truth (or non-truth, as it were)" of the

statements. <u>See</u> MTD Opp. at 21; <u>see also</u> <u>Browning</u>, 13 App. D.C. at 17 ("[I]f a party states a

material fact as true to his own personal knowledge to induce another to act upon such

representation, and that fact is susceptible of knowledge, but proves to be false, he is guilty of a

fraud which renders him liable to the person who relies upon and acts upon the representation as

true, to his injury; and it is no defense for the defendant that he believed the representation to be

true.") (emphasis omitted). Of course, every credit-card statement that contains erroneous

charges does not constitute fraud; here, however, Plaintiff has alleged enough facts to clear the

motion-to-dismiss standard. The Court thus concludes that McMullen has stated a claim for

common-law fraud against the Bank Defendants.

ii.      Conspiracy to Defraud

Whether Plaintiff has stated a claim for conspiracy is a slightly closer question, but the

same outcome obtains. In the District of Columbia, "'[t]o establish a *prima facie* case of civil

conspiracy, [a plaintiff] ha[s] to prove (1) an agreement between two or more persons (2) to

participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by

one of the parties to the agreement pursuant to, and in furtherance of, the common scheme.'"

<u>Saucier</u>, 64 A.3d at 446 (quoting <u>Paul v. Howard Univ.</u>, 754 A.2d 297, 310 (D.C. 2000)). As

28

relevant here, "conclusory allegations of an agreement do not suffice; parties must allege facts showing the existence or establishment of an agreement." Busby v. Capital One, N.A., 932 F. Supp. 2d 114, 141 (D.D.C. 2013). This means that mere allegations that Defendants "agreed among themselves" to defraud the plaintiff, without alleging facts that indicate they took steps to further the fraudulent scheme, will not defeat a motion to dismiss. See Brady v. Livingood, 360 F. Supp. 2d 94, 104 (D.D.C. 2004); see also Kissi v. Panzer, 664 F. Supp. 2d 120, 127 (D.D.C. 2009) ("Absent allegations as to the time, place[,] and content of the defendants' alleged fraudulent acts," and "the existence of an agreement among the defendants to engage in" those acts, plaintiff cannot state a claim for civil conspiracy.).

Defendants first ask the Court to dismiss Plaintiff's conspiracy claim because they believe she has not alleged an underlying tort. See MTD at 17; see also Plummer v. Safeway, Inc., 934 F. Supp. 2d 191, 198 (D.D.C. 2013) (common-law civil-conspiracy claim not independently actionable absent underlying tort). But, as the Court has just determined that the Complaint adequately pleads common-law fraud under D.C. law, this argument is unavailing.

The only other asserted basis for dismissing McMullen's conspiracy claim is Defendants' conclusory assertion that Plaintiff's allegation that "Defendant Banks understood and implicitly agreed" with One World and Bullen to defraud her, see SAC, ¶ 78, "'unadorned by any substantiating factual allegation[s],' is not enough to support a conspiracy claim against Chase." MTD at 17 (quoting Busby, 772 F. Supp. 2d at 278). Indeed, standing alone, such an allegation may not suffice to establish an agreement for purposes of a civil-conspiracy claim. But an examination of the entire Complaint reveals that it is, in fact, accompanied by an array of "specific facts to support the[] assertion[]." Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP, 68 A.3d 697, 713 (D.C. 2013).

As the Court has previously noted, the Complaint details at length the fraudulent scheme that, Plaintiff believes, resulted in the unauthorized credit line and charges she seeks to challenge.  See, e.g., SAC, ¶ 81.  She clearly identifies the parties involved in the conspiracy, their "common purpose" ("obtaining a profit" via "health care financing to One World customers"), their manner of operation (submitting and processing false applications for credit and charges), the actions taken by the Banks in furtherance of the conspiracy (opening the unauthorized credit lines, sending the false billing statements, "resolv[ing] to force her to pay" the unauthorized charges despite "lacking any executed proof of indebtedness"), and the injury she suffered as a result (payment of debt not owed, harm to her credit score, etc.).  See id., ¶¶ 1, 6, 74; MTD Opp. at 25.

This fraudulent scheme could not have operated as described by McMullen without an agreement between the fitness companies, on the one hand, and the Bank Defendants, on the other.  Indeed, it is hard to imagine that the Banks would have accepted applications for credit lines submitted on behalf of customers by the One World Defendants without an arrangement to do so.  The Complaint thus paints a picture not of "parallel conduct" or two actors doing "what was only natural anyway," Twombly, 550 U.S. at 564-66, but rather conduct reflecting an agreement.  And the Banks do not argue that they had, for instance, a legal agreement with One World and Bullen that was abused by those Defendants.

Plaintiff admits that "[w]ithout discovery, she cannot possibly know exactly which of the Bank Defendants' employees conspired with the precise members of the One World Fitness Defendants" and other similarly granular details.  See MTD Opp. at 25.  She has, nevertheless, alleged facts specific enough to allow the Court to draw an inference of an agreement.  But see, e.g., Bush v. Butler, 521 F. Supp. 2d 63, 68-69 (D.D.C. 2007) (dismissing conspiracy claim

where complaint "provid[ed] no description of the persons involved in the agreement, the nature of the agreement, [or] what particular acts were taken to form the conspiracy").  As a result, the Court concludes that the Complaint adequately alleges an agreement between the Bank Defendants and the One World Defendants.  It will not, therefore, dismiss Count III.

### 3.   Punitive Damages

Finally, the Court cannot permit Count VII to proceed, as D.C. law does not furnish Plaintiff with a stand-alone cause of action for "punitive damages."  Rather, such damages are available only as a remedy – and, even then, only in rare circumstances.  See Gharib v. Wolf, 518 F. Supp. 2d 50, 56 (D.D.C. 2007) (dismissing "punitive damages" count because "punitive damages is a remedy and not a freestanding cause of action"); see also Int'l Kitchen Exhaust Cleaning Ass'n v. Power Washers of N. Am., 81 F. Supp. 2d 70, 74 (D.D.C. 2000) (dismissing "punitive damages" count where it was "mispleaded . . . as a free-standing cause of action," but "declin[ing] to rule on whether [that plaintiff] may recover punitive damages as a remedy" until "a later time in the proceedings").  McMullen may not, therefore, allege a separate cause of action for punitive damages, but she may be able to recover such damages down the road.  The Court need not rule on their availability at this time.

## IV.   Conclusion

For the foregoing reasons, the Court will deny Synchrony's Motion to Compel Arbitration; grant Plaintiff's Motion for Leave to Amend the Complaint; grant Defendants' Motion to Dismiss as to Count VII; and deny the Motion as to Counts I and III.  An Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: February 19, 2016